IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

DIANE YARINA,

           Plaintiff,

vs.

COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

          Defendant.

CASE NO. 1:22-cv-1831

DISTRICT JUDGE
BRIDGET MEEHAN BRENNAN

MAGISTRATE JUDGE
JAMES E. GRIMES JR.

**REPORT &
RECOMMENDATION**

Plaintiff Diane Yarina filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Disability Insurance Benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In June 2020, Yarina filed an application for Disability Insurance Benefits alleging a disability onset date of September 11, 2018,[1] and claiming she was disabled due to lumbar facet joint syndrome, lumbar degenerative disc

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

disease, herniated discs, paresthesia, sacroiliitis, neuralgia, and chronic migraines. Tr. 137, 177. The Social Security Administration denied Yarina's application and her motion for reconsideration. Tr. 73, 78. Yarina then requested a hearing before an Administrative Law Judge (ALJ). Tr. 95.

In June 2021, an ALJ held a hearing. Yarina and a vocational expert testified. Tr. 38–67. In September 2021, the ALJ issued a written decision finding that Yarina was not disabled. Tr. 17–33. The ALJ's decision became final on August 9, 2022, when the Social Security Appeals Council declined further review. Tr. 1–4; *see* 20 C.F.R. § 404.981.

Yarina filed this action on October 12, 2022. Doc. 1. She asserts the following assignment of error:

> Whether the administrative law judge's decision is supported by substantial evidence when he did not properly evaluate the opinion of plaintiff's treating nurse.

Doc. 7, at 1.

**Evidence**

*1.    Personal and vocational evidence*

Yarina was born in 1969 and was 49 years old on her alleged disability onset date. Tr. 32. She last worked in 2018 as a technician in the "stamping room" at General Motors. Tr. 48.

*2.    Medical evidence*

In July 2017, Yarina had a lumbar MRI, which showed mild degenerative changes with no significant canal stenosis or foraminal

narrowing and shallow disc protrusions at L4–L5 and L5–S1.[2] Tr. 263–64. A hip MRI showed degenerative right sacroiliitis. Tr. 264.

In September 2017, Yarina saw Kenneth Grimm, D.O., at pain management. Tr. 262. Yarina reported a two-month history of intractable right-sided lumbosacral pain radiating to her thigh. Tr. 262. Her symptoms worsened with prolonged standing and trunk extension and rotation and modestly improved with activity modification and ice. Tr. 262. Yarina had tried chiropractic treatment and medications, "without benefit." Tr. 262. She performed a home exercise program that physical therapy had recommended. Tr. 262. Dr. Grimm reviewed Yarina's June 2017 MRI. Tr. 263–64. His impression was that Yarina had lumbar facet syndrome, "mechanical low back pain," lumbar herniated discs, and lumbar degenerative disc disease "plus/minus component of referred SI joint pain." Tr. 264. Dr. Grimm recommended that Yarina receive injections and continue her home exercise program. Tr. 265.

---

[2]     Vertebrae in a person's spine are given letter and number designations according to their location. The twelve vertebrae compromising the upper spine—the thoracic spine—are labeled at T1 through T12. *See* Thomas Scioscia, MD, Vertebrae in the Vertebral Column, Spine-health Resources, https://www.spine-health.com/conditions/spine-anatomy/vertebrae-vertebral-column [https://perma.cc/R9MM-TBZT]. The five vertebrae in the lower spine—the lumbar spine—are L1 through L5. *Id*. The five vertebrae at the bottom of the spine—in the sacrum—are labeled as S1 through S5. Thomas Scioscia, MD, Sacrum (Sacral Region), Spine-health Resources, https://www.spine-health.com/conditions/spine-anatomy/sacrum-sacral-region [https://perma.cc/S2BR-RBTB]. As part of the pelvic girdle, the sacrum forms joints at the hip bone called the sacroiliac joints. *Id*.

In February 2018, Yarina saw her doctor Ann Kelleher, D.O. Tr. 600. The treatment note states that Yarina last saw Dr. Kelleher in October 2017 and that Yarina was "doing better." Tr. 600. Yarina worked in a stamping plant and "was given restrictions for no lifting more than 10 [pounds] or prolonged standing for more tha[n] 15 min[utes] at a time." Tr. 600. Dr. Kelleher reviewed Yarina's pain management evaluation and assessed Yarina with degenerative disc disease of the lumbar spine and lumbar facet syndrome. Tr. 600–01. Yarina's "active problem list" included not-intractable migraines and herniated lumbar discs. Tr. 601. Dr. Kelleher completed Yarina's work restriction forms and referred Yarina to pain management and a spinal evaluation. Tr. 601.

In April 2018, Yarina saw Adrian Zachary, D.O., on Dr. Kelleher's referral, for Yarina's lower back and leg pain that began nine months before the visit. Tr. 583. Yarina stated that her right side was worse than her left. Tr. 583. She had constant pain that she rated, on average, a seven out of ten. Tr. 583. The lumbar injections that Yarina received from Dr. Grimm provided some relief, which lasted for six weeks. Tr. 583. Dr. Zackary's exam findings showed that Yarina couldn't perform a tandem gait but she could heel-toe walk without significant weakness. Tr. 586. She had lumbar tenderness on palpation and positive straight leg raise testing.[3] Tr. 586. Yarina had full

---

[3]     In a straight leg-raising test, the patient lies down, fully extends the knee, and lifts the leg. *See* Dorland's Illustrated Medical Dictionary, 33rd

strength in her arms and legs. Tr. 586–87. Dr. Zackary wrote that Yarina had "some mild sensory deficits in the right L5–S1 dermatome" and "left hemisensory deficits to light touch and pinprick including the face." Tr. 587. Dr. Zackary assessed Yarina with "hyperreflexia in the upper and lower limbs" and balance and sensory deficits. Tr. 587. In light of those findings, Dr. Zachary referred Yarina for a brain and cervical spine MRI "for a clearer understanding of her current myelopathic exam." Tr. 587. Dr. Zachary also assessed Yarina with a balance disorder, sensory deficits, and memory deficits. Tr. 588.

A May 2018 MRI of Yarina's brain showed "mild nonspecific supratentorial white matter disease," which was "not significantly changed" from Yarina's 2012 brain MRI and "likely represent[ed] chronic microvascular ischemia."[4] Tr. 438. An MRI of Yarina's cervical spine was unremarkable. Tr. 438.

In June 2018, Yarina saw Dr. Kelleher for a review of her medical problems. Tr. 569. Yarina was frustrated, tearful, and unable to exercise or

---

Edition, 2020, at 1871. Leg pain when raising the leg 30–90 degrees is a positive test and indicates lumbar radiculopathy. *Id*.

[4]    Microvascular ischemic disease "is an umbrella term that refers to a variety of changes in the small blood vessels of [one's] brain. Depending on the severity of these changes, they can cause a range of complications—from difficulty focusing to a stroke." *See* https://my.clevelandclinic.org/health/diseases/22927-microvascular-ischemic-disease#:~:text=Microvascular%20ischemic%20disease%20is%20a,cholesterol%20level%2C%20diabetes%20and%20smoking.    [https://perma.cc/GW5P-NAYT].

5

work due to lower back pain. Tr. 579. Dr. Kelleher assessed Yarina with chronic low back pain and prescribed Flexeril. Tr. 580.

In August 2018, Yarina saw a nurse practitioner for lower back pain. Tr. 576. Yarina said that her pain had worsened during the year before the appointment and affected her ability to work. Tr. 576. Yarina had pain in her lower back, hips, and down her legs. Tr. 576. She had intermittent numbness and tingling, especially in her right foot. Tr. 576. Her pain was constant and affected her sleep. Tr. 576. Yarina said that she took Flexeril once a day, which helped "mildly," and she also took ibuprofen. Tr. 576. Yarina's exam findings showed a limited range of motion and tenderness in Yarina's hips and spine and a positive straight leg raising test. Tr. 577. Yarina had a normal gait, intact reflexes and sensation, and "equal and strong" strength. Tr. 577. The nurse assessed Yarina with lumbar degenerative disc disease with chronic low back pain and prescribed a steroid. Tr. 577. Yarina requested a referral for the Mellen Center and the nurse provided a consultation to neurology. Tr. 578.

In mid-September 2018, Yarina saw Marissa McGinley, D.O., at the Cleveland Clinic Mellen Center, for a multiple sclerosis evaluation. Tr. 655. Yarina's diagnosis was listed as an abnormal brain MRI, suspected microvascular disease; multiple neurological symptoms of unclear etiology; and migraines. Tr. 568. Yarina reported the following issues since 2008: intermittent paresthesia, vision changes, bladder urgency and bowel symptoms, vertigo, numbness, cognitive changes, fatigue, balance issues,

6

migraines, and lower back pain. Tr. 569. On exam, Yarina had normal strength in her arms and legs and intact fine finger movements. Tr. 571. She had normal coordination. Tr. 571. A Romberg's test for impaired balance was normal. Tr. 572. Yarina had an antalgic gait.[5] Tr. 572. She could perform toe and heel walking but had significant difficulty with tandem walking. Tr. 572. Dr. McGinley wrote that while Yarina's symptoms "can overlap with those seen with [multiple scleroses], [Yarina's] brain MRI appearance [wa]s largely consistent with microvascular disease and has been stable since 2012." Tr. 572. Yarina's cervical spine MRI showed a normal spinal cord. Tr. 572. Given those imaging results and Yarina's neurological exam findings, Dr. McGinley opined that multiple scleroses was an unlikely diagnosis. Tr. 572. She recommended further diagnostics to determine the cause of Yarina's symptoms. Tr. 572. As for Yarina's migraines, for which Yarina took topiramate, Dr. McGinley wrote that topiramate may not be the "optimum choice" given Yarina's cognitive complaints and recommended that Yarina "see the headache team for further management." Tr. 572.

In November 2018, Yarina saw Dr. Zachary for lower back pain that radiated into her legs and numbness and tingling in her legs. Tr. 309. Yarina's exam findings showed no weakness or nerve root tension signs. Tr. 310. Yarina had tenderness to palpation in her sacroiliac joints and a painful range of

---

[5]     An antalgic gait is an abnormal gait due to the person trying to avoid pain. *See* Dorland's Illustrated Medical Dictionary, *supra*, at 96.

motion in her lower back upon flexion and extension. Tr. 310. Dr. Zachary administered bilateral sacroiliac joint injections. Tr. 308. A lumbar spine MRI taken a few days later showed minimal spondylosis without significant canal or foraminal stenosis, "not significantly changed" compared to Yarina's July 2017 MRI. Tr. 439–40.

In early January 2019, Yarina followed up with Dr. Kelleher. Tr. 550. Yarina reported that her pain remained in her lower back and was worse in the right sacroiliac region. Tr. 550. She occasionally had radicular pain in her right leg. Tr. 550. Yarina said that she was unable to perform her past job, which required "prolonged standing and lifting heavy steel." Tr. 550. She had checked "if alternate work was available to her" but "was told no." Tr. 550. Upon exam, Yarina had a normal gait and normal strength in her legs. Tr. 551. She had tenderness at the right sacroiliac joint but no spinal tenderness. Tr. 551. Dr. Kelleher assessed Yarina with right sacroiliac pain and chronic lower back pain "persistent despite injections." Tr. 552. Later that month, a thoracic spine MRI showed "mild remote benign midthoracic compression fractures" but "otherwise a normal thoracic spine." Tr. 443.

In early February 2019, Yarina saw Dr. Kelleher. Tr. 545. Yarina's "active problem list" included lumbar facet joint syndrome, lumbar degenerative disc disease, and migraine "without status migrainosus, not intractable." Tr. 546. Later that month, Yarina saw Dr. Zachary for a follow-up. Tr. 541. Yarina reported persistent pain in her lower back and legs and

"significant worsening [of] pain with all activities." Tr. 541. She denied dropping things, clumsiness, and tripping or falling. Tr. 541. Yarina said that she was on leave from her job due to her inability to stand for long periods of time. Tr. 542. Yarina's exam findings showed that Yarina was in no apparent distress and had intact strength in her arms and legs. Tr. 542. Dr. Zachary diagnosed Yarina with lumbar spine pain and cervicalgia and mentioned Yarina's upcoming neurology appointment. Tr. 542.

In May 2019, Yarina saw Dr. McKinley for a follow-up visit. Tr. 533. Yarina reported "dropping more things" during the few months before the appointment and she "continue[d] to have falls." Tr. 533. Yarina's migraines were better—she had two a month. Tr. 533. Dr. McKinley's exam findings showed that Yarina had full muscle strength and normal coordination Tr. 535. Yarina had a normal gait and standing balance. Tr. 536. She had an impaired tandem walk and impaired proprioception. Tr. 536. Dr. McKinley wrote that Yarina had "a constellation of neurological symptoms" and abnormal imaging, but she did not believe that Yarina met the criteria for multiple sclerosis. Tr. 536. "Given the sensory changes on exam" in Yarina's legs, Dr. McKinley was "more suspicious for peripheral nerve etiology, which would also contribute to [Yarina's] imbalance." Tr. 536. Dr. McKinley referred Yarina for a "peripheral neuropathy work-up." Tr. 536.

In June 2019, Yarina saw Ashley K. Miller, Ph.D., in the neurology department. Tr. 527. Yarina's medical history included migraine headaches,

chronic back pain, and a concussion from a car accident when Yarina was 23 years old. Tr. 528. Yarina "described longstanding symptoms of inattention." Tr. 528. She reported a history of gradual memory loss and being forgetful. Tr. 528. Yarina had poor sleep, which caused low daytime energy. Tr. 528. Dr. Miller's evaluation showed that Yarina had "mild and isolated weaknesses on measures of semantic verbal fluency, immediate memory recall for a word list, and memory recognition for visuospatial information." Tr. 529. Yarina had "poor organizational complex figure copying." Tr. 529. "Otherwise, the remainder of [Yarina's] cognitive test data was within expectation for [Yarina's] age and education with scores in the broad average range across measures" and Yarina's results were "generally intact." Tr. 529.

Later that month, Yarina had a medical appointment and reported back and joint pain. Tr. 385. She had a normal gait upon exam. Tr. 385.

In November 2019, Yarina went to the emergency room for a rash. Tr. 330. She denied back pain, weakness, numbness, and headaches. Tr. 332. She had a normal range of motion. Tr. 333. It was recommended that Yarina follow up with dermatology. Tr. 339.

In February 2020, Yarina saw Dr. Kelleher to discuss Yarina's attention deficit disorder. Tr. 480. Yarina also reported chronic insomnia. Tr. 480. Dr. Kelleher prescribed Adderall and recommended that Yarina visit a sleep clinic. Tr. 481.

In July 2020, Yarina saw Robert Jones, M.D., for tingling and pain in Yarina's arms from her shoulders to her fourth and fifth fingers. Tr. 471. Yarina said that the pain was "much worse at night" and it was difficult to sleep. Tr. 471. As a result of the pain, Yarina avoided carrying laundry, groceries, and her grandchild. Tr. 472. Yarina said that it felt similar to a prior experience that she had with elbow tendonitis. Tr. 472. Upon exam, Yarina had full range of motion in her neck and elbows and no sensory deficits. Tr 472. She had tenderness in both elbows and pain against resistance during wrist extension. Tr. 472. Dr. Jones diagnosed bilateral elbow tendonitis and prescribed gabapentin, which had helped Yarina in the past. Tr. 472. He also referred Yarina to occupational therapy. Tr. 472.

The next week, Yarina had a virtual follow-up visit with Dr. Kelleher. Tr. 469. Yarina reported that Adderall improved her focus and concentration and that it caused no side effects. Tr. 469. Dr. Kelleher wrote that Yarina was stable on her medication. Tr. 469.

Later in July 2020, Yarina followed up for her elbow tendonitis. Tr. 864. Yarina reported increasing pain in her left elbow and tingling into her fingertips. Tr. 864. Upon exam, Yarina's left elbow was very tender and Yarina's right elbow showed minimal findings. Tr. 864. Yarina was outfitted with a left elbow brace and encouraged to apply ice and attend her upcoming occupational therapy session. Tr. 865.

11

In April 2021, Yarina saw Nurse Ni Hariadi at Dr. Kelleher's office for a follow-up visit. Tr. 889–90. Yarina needed her Adderall and Topamax prescriptions refilled. Tr. 890. Yarina said that her migraines were stable on Topamax. Tr. 890. She requested a pain management consultation for back pain and Hariadi provided her with a referral. Tr. 890.

In June 2021, Yarina saw Nurse Hariadi for disability paperwork and pain in both arms. Tr. 886. Yarina reported chronic back pain and neck pain radiating to Yarina's arms and hands that began a month before the appointment. Tr. 886. Yarina described her pain as stabbing and throbbing that worsened when sleeping and she also reported numbness. Tr. 886. Yarina took Advil but it was not helping. Tr. 886. Hariadi's exam findings showed that Yarina was "well appearing" and in no acute distress. Tr. 886. She had tenderness to palpation in her paraspinal area along her lumbosacral region, neck, and arms. Tr. 886. She had positive Phalen's and Tinel's sign, which indicates carpal tunnel syndrome. Tr. 886. Hariadi assessed Yarina with cervical radiculopathy; prescribed medication; and referred Yarina to physical therapy. Tr. 886. Hariadi also diagnosed paresthesia with a history of carpal tunnel syndrome and ordered an EMG. Tr. 886. Hariadi wrote that Yarina's migraines were stable with treatment and listed Yarina's other diagnoses: lumbar degenerative disc disease, lumbar herniated discs, lumbar facet syndrome, and sacroiliitis. Tr. 887.

That day, Hariadi completed a questionnaire about Yarina's ability to do work-related activities. Tr. 876. Hariadi listed Yarina's diagnoses of sacroiliitis, lumbar facet joint syndrome, degenerative disc disease, paresthesia, and migraines. Tr. 876. Yarina's symptoms were back and neck pain and arm numbness and tingling. Tr. 876. Yarina's medical findings included arm numbness, tenderness in Yarina's paraspinal lumbosacral areas, and positive Phalen's and Tinel's signs. Tr. 876. And Yarina's treatment was gabapentin, a Medrol pack, Meloxicam, Topamax, and physical therapy. Tr. 876. Hariadi opined that Yarina could stand and walk less than two hours in an eight-hour workday. Tr. 876. She could sit for less than two hours and lift less than ten pounds. Tr. 876. Yarina needed to shift positions at will between sitting, standing, and walking, and needed to lie down at unpredictable times during the workday. Tr. 876. She had limitations in bending, grasping, and squatting. Tr. 876. Yarina would be absent from work more than four times per month and wasn't "capable of performing a full-time job that is [eight] hours per day, five days per week, on a regular and continuing basis." Tr. 876.

### 4.    *State agency opinions*[6]

In September 2020, Abraham Mikalov, M.D., and Karla Delcour, Ph.D., reviewed Yarina's record and opined that there was insufficient evidence to

---

[6]    When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the

evaluate Yarina's physical and mental impairments, respectively, and that Yarina had not responded to attempts to reach her. Tr. 68–71. In December 2020, Leslie Green, M.D., and Vicki Warren, Ph.D., agreed with Dr. Mikalov's and Dr. Delcour's assessments. Tr. 74–77.

   5.   *Hearing testimony*

Yarina, who was represented by counsel, testified at the telephonic administrative hearing held in June 2021. Yarina stated that she lives with her boyfriend and her six-month-old granddaughter. Tr. 46. Yarina has a driver's license and drives about twice a week to buy groceries or take her granddaughter to an appointment. Tr. 47.

When asked why she was unable to work, Yarina answered that she has problems with her back. Tr. 49. She can't grasp, bend, or lift and she was in constant pain. Tr. 49. Yarina's doctor had placed Yarina on work restrictions to see if Yarina's pain would improve, but then "it got hard to stand." Tr. 49. The doctor provided injections "and so far nothing has worked." Tr. 49. Yarina described daily pain that began "in the core of [her] back" and radiated down her legs. Tr. 50. A few weeks before the hearing it started "coming up into [her] neck." Tr. 50. Yarina's arm problems "have always been since the back started" and "[i]t just feels like neuropathy everywhere." Tr. 50. Changing positions

---

claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

helped Yarina's pain. Tr. 50. Yarina stated that she can't stand in line at the store for more than five minutes. Tr. 50.

On average, Yarina rated her pain a five or a six on a scale of ten. Tr. 50. She took medication every day. Tr. 50. She estimated that she can sit for 30 minutes, stand for 10 minutes, and walk for 10 minutes. Tr. 51. She can lift and carry a gallon of milk. Tr. 51. Yarina and her boyfriend take care of Yarina's granddaughter. Tr. 52. Yarina performed about 80 percent of the household chores but needed help with laundry and "heavy items." Tr. 54.

Yarina stated that her conditions have worsened since 2018. Tr. 55. Her ability to sit is limited because her legs go numb. Tr. 56. To alleviate the numbness, Yarina tries to walk around for a couple of minutes, stretch it out, or "take something." Tr. 56. Lying down on the couch with her feet up is the most comfortable position. Tr. 57. When asked how, given her impairments, Yarina took care of her granddaughter, Yarina explained that she doesn't walk with her granddaughter. Tr. 57. When Yarina feeds her granddaughter, she props her up on a pillow. Tr. 57. Yarina tries to keep her granddaughter in a "bouncy thing[]" until Yarina's boyfriend comes home, and then he does all the things that are hard for Yarina to do. Tr. 57.

Yarina stated that the numbness in her arms wakes her up at night. Tr. 59. She has constant tingling in her fingers; as a result, she can't pinch anymore, can't grasp "like that," and she has a hard time opening jars and

15

bottles. Tr. 59. When she tries to open things, she feels a cramping pain. Tr. 60. She drops a lot of silverware when she does dishes. Tr. 60.

The ALJ discussed with the vocational expert Yarina's past relevant work as an auto factory technician. Tr. 62. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Yarina could perform Yarina's past work or any other work if the individual had the limitations assessed in the ALJ's residual functional capacity (RFC) determination, described below.[7] Tr. 62–64. The vocational expert answered that such an individual could not perform Yarina's past work but could perform the following jobs in the national economy: ticket taker, storage clerk, and mailroom clerk. Tr. 63–64. When asked about the customary tolerance for off-task behavior and absenteeism, the vocational expert stated that a person could be off-task no more than 10 percent of the workday and absent no more than one day a month. Tr. 64–65.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1.    The claimant meets the insured status requirements of the Social Security Act through March 31, 2024.

---

[7]    A residual functional capacity (RFC) is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

2.  The claimant has not engaged in substantial gainful activity since September 11, 2018, the alleged onset date (20 CFR 404.1571 *et seq*.).

3.  The claimant had the following severe impairments: minimal lumbar spondylosis; mild remote benign mid-thoracic compression fractures; degenerative right sacroiliitis; essential hypertension; epicondylitis; migraines; vertigo; obesity; attention deficit disorder; and anxiety (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work, as defined in 20 CFR 404.1567(b) except she can frequently operate right and left hand controls; frequently handle with the right and the left; frequently finger with the right and the left; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle; frequently be exposed to humidity and wetness; has the ability to understand, remember, apply information, concentrate, persist, and maintain pace to perform simple, routine, and repetitive tasks, but not at production rate pace (i.e. assembly line work); limited to simple work related decisions in using her judgment and dealing with changes in the work setting; and able to frequently interact with supervisors, coworkers, and the public.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

17

7. The claimant was born [i]n … 1969 and was 49 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563). The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 11, 2018 through the date of this decision (20 CFR 404.1520(g)).

Tr. 20–33.

### Standard for Disability

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

18

period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

> 1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.
>
> 2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.
>
> 3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.
>
> 4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.
>
> 5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The

claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court ... asks whether" the "existing administrative record ... contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings ... as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the

20

conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

Yarina argues that the ALJ erred when he rejected Nurse Hariadi's opinion, "particularly regarding [Yarina's] ability to stand, walk and lift." Doc. 7, at 14.

The Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, and extent; specialization; and other factors. 20 C.F.R. §§ 416.920c(a), 416.920c(c)(1)–(5). *Supportability* and *consistency* are the most important factors. *Id.* at § 416.920c(a). The Commissioner must explain the *supportability* and *consistency* factors when discussing a medical opinion. *Id.* at § 416.920c(b)(2). The Commissioner is not required to discuss the remaining factors. *Id.* "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Toennies v. Comm'r of Soc. Sec.*, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

The ALJ considered Nurse Hariadi's opinion as follows:

> The undersigned also read and considered the
> opinions from Ni Ketut Hariadi, APRN, CNP,
> submitted on a form titled "Medical Opinion Re:
> Ability to Do Work-Related Activities" dated June 8,
> 2021 (4F). On the form, Ms. Hariadi checked a box
> answering "No" to the question "In your professional
> opinion, is your patient capable of performing a full-
> time job that is 8 hours per day, five days per week,
> on a regular and continuing basis" (4F/1). Ms.
> Hariadi went on to check boxes indicating the
> claimant was limited to stand and walk less than 2
> hours in an 8-hour workday; limited to sitting less
> than 2 hours in an 8-hour workday; and limited to
> lift and carry less than 10 pounds on a frequent and
> occasional basis (4F/1). She went on to check boxes
> on the form indicating the claimant would need to
> shift positions at will between sitting and
> standing/walking; stated the claimant was also
> limited in "bending, grasping, squatting;" and
> checked the box indicating the claimant would likely
> be absent from work more than four times per month
> on average due to impairments (4F/1). These
> opinions are not persuasive. Overall, the extreme
> limitations are unsupported by the treatment
> records and longitudinal progress reports coupled
> with the conservative treatment during the relevant
> period. As an initial matter, statements that the
> claimant is unable to work, or cannot perform any
> jobs, are not medical opinions, but are
> administrative findings requiring familiarity with
> the Regulations and legal standards set forth within
> the case. Such issues are reserved to the
> Commissioner, who cannot abdicate statutory
> responsibility to determine the ultimate issue of
> disability. Further, the physical exam findings
> during the relevant period consistently noted
> tenderness over the low back and hips, and more
> recent records also noted tenderness to the bilateral
> elbows and positive Phalen and Tinnel testing
> (2F/112; 3F; 5F/10). The treatment records support
> some level of physical limitation, but … the evidence
> is not fully consistent with the extreme level of

> limitation suggested by Ms. Hariadi's opinions (2F; 3F; 4F; 5F). For these reasons, the undersigned does not find these opinions to be persuasive.

Tr. 30–31.

Yarina argues that the ALJ "failed to apply the proper legal standards" and submits that Hariadi is a "treating source." Doc. 7, at 15, 17. It is not clear what argument Yarina is trying to make here. Yarina concedes that the regulations governing this case don't require the ALJ to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion," *id.*, at 16, including *treating source* opinions. *See* 20 C.F.R. § 416.920c. Rather, the ALJ considers the *treatment relationship* as one of the factors when evaluating any medical opinion. *See id.* at § 416.920c(c)(3). But the ALJ isn't required to discuss that factor, as Yarina also acknowledges, Doc. 7, at 16–17. *See* 20 C.F.R. § 416.920c(b)(2). So to the extent that Yarina alleges that the ALJ erred by not discussing Yarina's treatment relationship with Hariadi, Yarina's argument fails.

Yarina writes, "[i]f the Judge finds two or more medical opinions are both equally well supported and consistent with the record, he/she must articulate what factors were most persuasive and differentiating the opinions." Doc. 7, at 17. Yarina appears to be referring to 20 C.F.R. § 416.920c(b)(3), which refers to "[e]qually persuasive medical opinions or prior administrative medical findings about the same issue," and provides:

> When we find that two or more medical opinions … about the same issue are both equally well-

23

> supported … and consistent with the record … but
> are not exactly the same, we will articulate how we
> considered the other most persuasive factors
> [including the treating relationship] … for those
> medical opinions … in your determination or
> decision.

Yarina doesn't identify *two or more medical opinions* in the record that fit this bill. The only other opinion evidence in the record aside from Hariadi's opinion is from the state agency reviewers. The ALJ discounted those opinions because the reviewers, relying on an incomplete record, found that there was insufficient evidence to evaluate Yarina's claim. Tr. 29. So if Yarina's reference to the text in 20 C.F.R. 416.920c(b)(3) is an attempt to show that the ALJ had a duty to discuss all the factors when evaluating Hariadi's opinion, Yarina's reliance upon that language is misplaced.

In short, Yarina hasn't shown that the ALJ "failed to apply the proper legal standards" to Hariadi's opinion. Doc. 7, at 15.

That leaves the substance of the ALJ's evaluation of Hariadi's opinion. The ALJ explained that Hariadi's opinion that Yarina couldn't perform work was an issue reserved for the Commissioner. Tr. 30. Yarina appears to take issue with that finding, Doc. 7, at 15, but the ALJ's statement is accurate. *See* 20 C.F.R. § 414.920b(c)(3)(i) ("Statements on issues reserved to the Commissioner …. [include] [s]tatements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work."). Yarina points out that Hariadi's opinion is the only opinion in the record describing Yarina's functional limitations but doesn't articulate an argument based on that fact.

24

Doc. 7, at 19. To the extent Yarina suggests that the ALJ was required to base the RFC on opinion evidence, she is mistaken. *See, e.g., Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) (rejecting the claimant's argument that the ALJ's RFC was faulty because it wasn't based on a physician's opinion). "[T]o require the ALJ to base her RFC finding on a physician's opinion, 'would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." *Id.* (citation omitted).

Yarina attacks the ALJ's finding that Hariadi's opinion was unsupported by, and inconsistent with, the record. Doc. 7, at 17–19. In support of her argument, Yarina cites evidence that she believes supports Hariadi's opinion. *Id.* (citing treatment notes from visits with Drs. Grim, Zachary, McGinley, and Kelleher and Nurse Hariadi). But the ALJ discussed Yarina's visits with those providers. Tr. 25 (Dr. Grim in September 2017, Tr. 262–68); Tr. 26 (Dr. Zachary in April 2018, Tr. 583–88; Dr. McGinley in September 2018, Tr. 568–72); Tr. 27 (Dr. McGinley in May 2019, Tr. 533–36; Dr. Kelleher in January and February 2019, Tr. 545, 550); Tr. 28 (Nurse Hariadi in April and June 2021). Yarina cites her imaging results, but the ALJ discussed those findings, too. Tr. 25 (July 2017 lumbar MRI showing shallow disc protrusions with no canal stenosis or foraminal narrowing and mild degenerative changes;

hip x-rays showing right degenerative sacroiliitis but normal right hip joint space and normal left sacroiliac joint); Tr. 27 (November 2018 lumbar MRI showing "minimal lumbar spondylosis without significant canal or foraminal stenosis, not significantly changed since the prior study in July 2017"). And the ALJ listed Yarina's diagnoses, Tr. 20, and discussed the fact that Yarina had difficulty with her tandem gait, Tr. 27; balance issues, Tr. 26, 27; tenderness and pain, Tr. 25–29; positive straight leg raise testing, Tr. 26; and that Yarina reported numbness and falls, Tr. 26.

The ALJ also noted that Yarina's thoracic and lumbar imaging during the time period was "essentially normal with no evidence of large disc herniations, and only mild inflammatory facet joint changes." Tr. 27. The ALJ cited Yarina's consistent exam findings of intact strength and sensation. Tr. 26–27. And the ALJ explained that Yarina's statements about the severity of her symptoms were not entirely consistent with the record. Tr. 29. Yarina does not challenge any of those findings.

In other words, the ALJ considered the evidence that Yarina claims supports Hariadi's opinion but disagreed with Hariadi's conclusions. The ALJ's comment that Hariadi's assessed limitations were "extreme" is accurate, and the ALJ's finding that the evidence didn't support those limitations is supported by the record that the ALJ recounted. The ALJ also relied on the fact that Yarina had conservative treatment, a finding that Yarina does not challenge. Conservative treatment is a valid reason to discount opinion

26

evidence. *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 631 (6th Cir. 2016) (collecting cases). Yarina's challenge to the ALJ's evaluation of Hariadi's opinion amounts to a request that the Court re-weigh the evidence, which this Court cannot do. The ALJ's evaluation of Hariadi's opinion is supported by substantial evidence, so it must be affirmed. *Jones*, 336 F.3d at 477.

### Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: July 6, 2023

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).